IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                          Crim. No. 13-PO-2255 KBM

MEGAN N. BUCK,

       Defendant.

## **AMENDED ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS[1]**

       THIS MATTER is before the Court on Defendant Buck's Motion to Suppress *(Doc. 21)*. The Court has reviewed the motion and exhibits accompanying the motion and the Government's Response in opposition to the motion. Additionally, the Court gave due consideration to Defendant's Reply and attached exhibits. The Court conducted an evidentiary hearing on October 29, 2013, and now sets forth its findings of fact and conclusions of law.

       1. Defendant Megan Buck and her friend, Nicolas Denetdam, admittedly had been consuming alcoholic beverages in the afternoon of February 7, 2013.

       2. Defendant Buck then drove a truck, with Denetham in the passenger seat, and were engaged in deep conversation. Because of that distraction, Ms. Buck drove past their expected route home and inadvertently drove into the Louisiana-Gibson Gate entrance to Kirtland Air Force Base.

---

[1] This amended order is entered to provide clarification orally requested by the defendant at the time of trial.

3. This occurred at about 5:20 pm, and it was not yet dark. Lit signs clearly identified that they entering Kirtland Air Force Base.

4. Contrary to her testimony at trial, the Court finds that Ms. Buck then twice circled the visitor's center building trying to leave the base but evidently was still lost. She then approached the Guard Post manned by Senior Airman Joshua Minton.

5. Airman Minton had observed Ms. Buck's circling of the visitor center and called Officer Robyn Catarius who was therein to inform her that it appeared the driver of the black truck was lost.

6. When Ms. Buck approached the Guard Post and informed Airman Minton that she was indeed lost and "not supposed to be" on the base, the Airman told her he would help her to leave the base by again circling back to the visitor center parking lot where there was a clearly marked exit.

7. Airman Minton moved to the area of some bollards and instructed Ms. Buck to drive her truck to the right of those bollards. At that time, Ms. Buck started tapping repeatedly on the brakes and could not effectuate the turn. When the erratic driving put the airman in danger of being hit by the vehicle, he pounded twice on the truck's hood yelling "stop, stop."

8. When the truck finally did stop, Airman Minton approached the vehicle's window and took the keys to the truck. He detected the strong "sweet" scent of alcohol emanating from within the cab of the truck, and he believed that there was a chance that the driver was impaired, although he was not sure if it was by alcohol or some medical condition.

9. Airman Minton believes that Ms. Buck denied having consumed alcohol, but

Ms. Buck actually admitted in her testimony that she told the airman that she "had a little to drink" that afternoon.

    10. Contrary to usual procedure for conducting "pre-exit" tests from inside the vehicle, Airman Minton had Ms. Buck exit the vehicle to perform that first set of tests.

    11. While conducting those tests, Ms. Buck leaned her body, which was at that time 90 pounds overweight, against the truck. Ms. Buck performed poorly on the finger dexterity test because contrary to directions, she counted "1234-1234" instead of "1234-4321" when performing the test.

    12. Because Ms. Buck, a high school graduate, indicated that she "didn't know her alphabet," Airman Minton chose not to use the alphabet field sobriety test.

    13. In the counting test, Ms. Buck performed poorly when asked to count upward from 25 through 42. Airman Minton admits that he incorrectly chose a number ending in a 5 and should have had her count down from 42 instead of up from 25. Both of these incorrect instructions, however, should have made it easier for Ms. Buck to pass the test, which she did not.

    14. Based upon the poor performance during the pre-exit tests, Aiman Minton moved on to a full set of field sobriety tests. Ms. Buck performed poorly on the Horizontal Gaze Nystagmus (HGN) and was notably swaying 2-4 inches from her center. During the walk and turn test, Ms. Buck experienced difficulty walking a straight line heel-to-toe as directed. Contrary to counsel's intimations, there is no evidence that the sidewalk on which this test was performed was sufficiently unlevel or uneven to have negatively affected Ms. Buck's performance. As to the one-leg stand, Ms. Buck

could not stand on just one leg for the required period.  Her complaint that this was the result of "bad knees" is not credible.

15. Airman Minton admits that he did not perform the field sobriety tests in strict conformance with how they are to be given.  Specifically, he did not contemporaneously log the perceived deficiencies as he conducted the test which is a requirement.  Because of this deficiency and the changing of the guard, a decision was made by his superiors to have Ms. Buck resubmit to the field sobriety tests.  The deficiencies in Airman Minton's testing go to the weight, not admissibility, of his observations.

16. Airman Minton's actual observation of Ms. Buck's impaired driving (twice circling the visitor center when the exit was clearly marked, her inability to effectuate the turn to the visitor station lot as directed by the Airman thereby placing his body in danger of being hit), the odor of alcohol from the truck's cab and her poor performance on the field sobriety tests he conducted, all gave him probable cause to believe that she was driving under the influence of alcohol and supported obtaining a chemical test to confirm his assessment.

17. Because under all the circumstances such probable cause existed, the intoxilyzer test was not taken in violation of Ms. Buck's rights, and therefore the motion to suppress the intoxilyzer breath results will be denied.

18. The decision to readminister the field sobriety tests to Ms. Buck to assure that they were performed in compliance with accepted procedures did not unduly delay the length of the detention or result in harassment that would convert the investigation into a violation of her constitutional rights.

**IT IS SO ORDERED.**

_____
UNITED STATES CHIEF MAGISTRATE JUDGE